Crucible Steel Casting Company v. Commissioner.
Crucible Steel Casting Co. v. Commissioner
Docket Nos. 4201, 6054.
United States Tax Court
1946 Tax Ct. Memo LEXIS 216; 5 T.C.M. (CCH) 284; T.C.M. (RIA) 46083; April 16, 1946
*216 Vernon L. Stover, Esq., 1608 Walnut St., Philadelphia 3, Pa., for the petitioner. Robert H. Kinderman, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These consolidated proceedings involve deficiencies in income and excess profits taxes for the calendar years 1940, 1941 and 1942 as follows: Declared
Docket
Value Excess
Excess
No.
Year
Income Tax
Profits Tax
Profits Tax
4201
1940
$5,068.21
$2,209.88
$ 4,949.30
1941
8,309.24
2,094.87
25,666.10
6054
1942
631.06
39,763.66
In addition to other adjustments which are not contested, the respondent determined that salaries paid to four of petitioner's executive officers were in excess of reasonable allowances for compensation for their services rendered during the taxable years. The correctness of such action is the sole issue before us. In Docket No. 6054 petitioner's taxable income for 1942 has been decreased by the sum of $80,000 pursuant to a determination of the Secretary of the Navy under the Renegotiation Act. The parties have stipulated that petitioner's taxable income for 1942 is subject to modification in accordance *217 with the final determination in a matter now pending before the Tax Court in Crucible Steel Casting Company v. The Secretary of the Navy, Docket No. 13-R. Findings of Fact Petitioner is a Pennsylvania corporation organized in 1905 with its principal office and place of business in the Borough of Lansdowne. Its Federal income and excess profits tax returns for the taxable years in question were filed with the collector of internal revenue for the first district of Pennsylvania. Since its organization petitioner has been continuously engaged in the manufacture of steel castings of all types, including machinery parts for manufacturers of various types of equipment. The manufacturing process requires the use of various alloys, such as nickel, chrome, molybdenum, carbon, manganese and other chemical parts of steel. It is a highly technical field and requires years of experience and the services of highly trained chemists, metallurgists and chemical engineers. In addition special equipment is required, such as electric furnaces, heat treating furnaces, special mixture machines for the preparation and control of special sands, pressure work, and other equipment for testing the castings *218 hydrostatically, radio-graphic examination and magnaflux for the purpose of determining internal flaws. The electric furnaces use a temperature as high as 3200 degree Fahrenheit and special caution must be taken with the cooling temperatures in the sand mold. During the taxable years petitioner was not a prime contractor of the United States government or any of its agencies. Its orders were received from such prime contractors throughout the Atlantic seaboard and at all times during the taxable years its products were subject to the highest priority regulations. Petitioner's orders and production record for the years 1939 through 1942 were as follows: Year
Orders
Production Record
1939
6,437
167,668 pieces
1940
8,512
236,429 pieces
1941
9,970
402,600 pieces
1942
7,722
418,193 pieces
Petitioner's gross sales during the years 1939 to 1942, inclusive, were as follows: 1939
$ 450,002.78
1940
739,403.00
1941
1,375,268.00
1942
1,968,059.00 Its net earnings for those years before taxes were as follows: 1939
$ 35,330.60
1940
61,277.51
1941
177,252.01
1942
289,848.81
Petitioner does not have any separate *219 sales organization and during the taxable years did not employ any sales agency or jobber to obtain orders although it is customary in the steel business to have some form of sales organization. In such circumstances outside sales agencies received a commission approximating five per cent of sales. Until the summer or fall of 1939 petitioner's big problem was to get orders for business. All of the executive officers, whose compensation is in controversy, took their partin obtaining such orders. Commencing in the fall of 1939 the problem of obtaining orders became less acute. The problem of increasing production to fill the orders became progressively more difficult during the years 1940 to 1942. During the taxable years petitioner had the following stockholders: 1940 Shares
1941 Shares
1942 Shares
C. R. H. Cunningham
1,771
1,371
1;110
H. C. Cunningham
410
410
570
Harry L. McClees
215
215
297
Harry C. Bloodsworth
290
290
390
C. R. H. Cunningham and Marie E. Cunningham
2,000
2,400
2,800
Elizabeth M. Cunningham
630
630
Estate of Elizabeth M. Cunningham
Marie Cunningham
200
200
200
Irene D. Cunningham
442
442
482
Mildred Shimer Westover
13
13
13
Ellen Shimer
13
13
13
Provident Trust Company, Trustee
1,500
518
518
Fidelity-Philadelphia Trust Company, Trustee
280
280
280
Lillian F. Thorpe
516
516
H. Katherine Bullock
516
635
William F. Leopold, Jr., Trustee
400
Elizabeth C. Parker
160
Totals
7,814
7,814
9,014
*220 During the years 1939 to 1942, inclusive, petitioner paid the following dividends: 1939
None
1940
$1.25 per Share
5%
$ 9,767.50
1941
2.50 per Share
10%
20,735.00
1942
2.50 per Share
10%
22,535.00
In the industry of which petitioner is a part it has been a long established practice for executive officers to base their compensation on the profits of the business. In unprofitable years compensation is negligible and in profitable years the compensation is increased in an effort to compensate for the other years. Petitioner followed the same pattern in dealing with the officers whose salaries are now at issue. For many years it has been the practice of petitioner to pay bonuses to certain key men in the shop, including foremen, technicians, furnace men and superintendents. During the taxable years this group of individuals numbered 13 and during 1940 the key men received total salaries amounting to $26,927.56 and bonuses totaling $11,459.82. In 1941 these same individuals received total salaries amounting to $31,461.80 and bonuses of $34,312.19. In 1942 this group received salaries amounting to $32,031.80 and bonuses of $58,294.31. On June 10, 1940, petitioner's *221 board of directors, including C. R. H. Cunningham, H. C. Cunningham, H. L. McClees and H. Bloodsworth, Jr., by appropriate action voted to pay the following men a bonus equal to any dividends paid during the year and, in addition, voted a further bonus up to $25,000 if petitioner should have net earnings in excess of $50,000. This bonus was to be divided as follows: C. R. H. Cunningham, President
40%
H. C. Cunningham, Vice-Pres. and Treas-
urer
30%
H. L. McClees, Secretary
20%
H. C. Bloodsworth, Jr.
10% In February 1941 the board of directors fixed salaries of these men as follows: C. R. H. Cunningham $400 weekly
H. C. Cunningham
300 weekly
H. L. McClees
200 weekly
H. C. Bloodsworth, Jr.
100 weekly
On June 11, 1941, petitioner's board of directors, which still included these four individuals, voted to pay them in addition to their salaries a total bonus of $2,000 monthly as long as one per cent of dividends were paid to the stockholders. At the same meeting an additional bonus of $50,000 was voted contingent on petitioner's profits for the year exceeding $150,000. Both of these bonuses were to be distributed in the same way as the bonus *222 provided under date of June 10, 1940. In January 1942 petitioner created an incentive bonus for all hourly employees in the plant which brought the whole organization under a bonus plan. The bonus for the executive officers was eliminated and their salaries increased proportionately so that their 1942 compensation approximated the overall compensation set up for them in 1941. During the taxable years involved the following officers and directors received total compensation as follows: Title
1940
1941
1942
C. R. H. Cunningham
President-Director
$25,760.00
$46,790.00
$49,600.00
H. C. Cunningham
Vice-Pres., Treasurer-
Director
18,862.67
34,984.00
37,200.00
H. L. McClees
Secretary-director
12,441.67
23,550.00
24,800.00
H. C. Bloodsworth, Jr.
Director
6,113.34
11,620.00
12,400.00
In determining the deficiencies herein respondent disallowed a part of this compensation as follows: 1940
1941
Officer
Allowed
Disallowed
Allowed
Disallowed
C. R. H. Cunningham
$15,760.00
$10,000.00
$26,790.00
$20,000.00
H. C. Cunningham
11,362.67
7,500.00
19,984.00
15,000.00
H. L. McClees
7,441.67
5,000.00
13,550.00
10,000.00
H. C. Bloodsworth, Jr.
3,613.34
2,500.00
7,620.00
5,000.00
$38,177.68
$25,000.00
$67,944.00
$50,000.00
*223 1942
Officer
Allowed
Disallowed
C. R. H. Cunningham
$29,600.00
$20,000.00
H. C. Cunningham
22,000.00
15,000.00
H. L. McClees
14,800.00
10,000.00
H. C. Bloodsworth, Jr.
74,000.00
50,000
The amounts disallowed by respondent represent the year-end bonuses provided at the directors' meetings of June 1940 and 1941 and $50,000 of the group's total compensation for 1942. C. R. H. Cunningham was one of the organizers of petitioner and during the taxable years served as president. He died in December 1943. As chief executive officer he devoted his entire time to the business and had charge of overseeing the entire manufacturing processes. He handled raw material purchases and supervised petitioner's expansion program including the planning, arranging, buying and engineering of the installation of equipment. During the taxable years involved he worked 9 or 10 hours a day, 6 days a week and sometimes on Sundays. H. C. Cunningham was one of the organizers of petitioner and during the taxable years served as vice-president and treasurer. He devoted his entire time to the business and had charge of the steel milling, specification work, metallurgical laboratory, *224 chemical laboratory and all specifications to be furnished the Army and Navy. During the taxable years he worked from 8 to 5, 7 days a week and frequently returned to work in the evenings. H. L. McClees came with the petitioner in November 1918 and during the taxable years was secretary. He has since been elected president of petitioner. He devoted his entire time to the business and handled most of the office work, which included the making of bids, supervising the pricing structure under O. P. A. regulations, obtaining priorities, and training the office force, which more than doubled during this period. McClees worked 7 days a week, frequently working 16 hours a day. Harry Bloodsworth went to work for petitioner in February 1937 and during the taxable years devoted his entire time to the business. He went to work in the shop in an effort to learn the business, did some laboratory work and early in 1939 joined the sales force. Prior to joining petitioner he worked as a salesman for a plastic company and made $45 a week. He began working for petitioner at a salary of $35 a week. While attending school he worked in various departments of the plant during the summer months. In 1940 *225 he was approximately 32 years of age. During the taxable years he worked 9 hours a day, 7 days a week. None of these individuals took any vacation during the taxable years or in the years immediately preceding. They were always on call and denoted their time and attention to planning, conceiving and carrying into execution the expansion of production so as to enable petitioner to get its share of the money being spent in the nation's defense program. In 1939 petitioner had approximately 200 employees. At the end of 1942 it had approximately 400. During the taxable years petitioner was required to increase its production facilities and in 1941 it began to operate with three separate shifts a total of 24 hours a day. The combined talents of the four men, whose compensation is at issue, were responsible for the increase in production without interruption. Reasonable compensation for these individuals during the taxable years is as follows: 1940
1941
1942
C. R. H. Cunningham
$25,760.00
$36,790
$39,600
H. C. Cunningham
18,862.67
26,484
29,500
H. L. McClees
12,441.67
18,550
19,800
H. C. Bloodsworth, Jr.
6,113.34
10,120
10,750
Opinion The *226 only question here involved is the reasonableness of the compensation paid by petitioner to the four executive officers during the taxable years 1940, 1941 and 1942 Petitioner points to the longer hours, increased responsibilities and its production record as justifying the compensation paid. It is argued that the officers' low salaries in the lean years preceding 1940 required an upward revision and that the officers have been only fairly compensated for their efforts in increasing sales and production. The dividend paying record during the taxable years is cited as proof that the salaries were not intended to be distribution of corporate profits in lieu of dividends. Respondent argues that petitioner's profits are only a natural result of the war program, that no sales organization was necessary and that the salaries of these officers in earlier years are a fair standard in determining reasonableness during the taxable years before us. He insists that he has recognized and rewarded the longer hours and increased responsibilities. The controversy appears to turn on the sums paid by petitioner pursuant to the bonus arrangement provided for by appropriate action on June 10, 1940, and *227 on June 11, 1941. At the earlier meeting the directors voted an additional bonus of $25,000 if profits for the year exceeded $50,000. At the June 1941 meeting a similar resolution was adopted providing for a bonus of $50,000 for the same individuals in the event corporate earnings exceeded $150,000. The compensation for 1942 consisted of straight salary without the so-called excess bonus. Corporate resolutions authorizing the bonuses and salaries are entitled to weight. . Under ordinary circumstances the directors are the best judge of the reasonableness of compensation to be paid. Nevertheless the judgment of the directors is not conclusive of the matter and where, as here, the same individuals received the salary and bonuses voted by themselves as directors, we have the duty to examine all the facts to determine whether or not the compensation is such in fact and reasonable. In small corporations, such as petitioner, the fixing of compensation based in part on contingent arrangements frequently involves some element of chance. In the *228 present case the preamble of the directors' resolution adopted June 10, 1940, stated: With the prospect of continued operations at close to capacity, which should mean profltable business operations for some time to come, * * * During the month immediately preceding this meeting of the directors (May 10, 1940) Germany had invaded the lowland countries of Europe. On May 16, 1940, the President of the United States asked the Congress for 3 1/4 billion dollars to be used in equipping an army, modernizing military equipment and increasing production facilities for articles that might be needed in the defense of this country. He called the nation's attention to the threat then existing abroad and asked the Congress to make appropriate financial provision for this tremendous defense program. See Vol. 86, Cong. Record, p. 6243. On May 29 the English armies were evacuated from Dunkirk. On June 10, 1940, the date of the meeting, Italy entered the war against France and England. Congressional work on the Revenue Act of 1940 was commenced immediately after the President's speech and the first committee report was published on June 10, 1940. The recommendations of the Congress called for increased *229 taxes of every kind and an excess profits tax on corporations. See C.B. 1940-2, p. 566. In the light of this factual background, we think that the contingent element necessary to support petitioner's bonus arrangement is lacking. . It must have been obvious to petitioner's directors that in the balance of 1940 and in the ensuing years, petitioner, which had been operating at close to capacity since the fall of 1939 would benefit more than ever by the nation's accelerated defense program. We think any fair minded person would conclude that petitioner's profits would be in excess of the amount called for in the corporate resolution. Nevertheless, we have found that the compensation paid these men during the taxable year 1940 was reasonable in amount and for services actually rendered. By virtue of their long training and experience they were able to expand petitioner's facilities without any interruption in production and, in general, prepare petitioner for the increased production demands which were bound to come. By their skill in designing, planning and putting into execution plans to increase production, this *230 group of individuals enabled petitioner to take advantage of the defense program as outlined by the President. This required long hours, increased responsibilities and heavier duties generally. The work of these men is entitled to recognition and we have found that the compensation paid them in 1940 was, in fact, reasonable. Their compensation for the year 1941, which was increased substantially over 1940, is, we think, excessive. The corporate resolution of June 11, 1941, authorizing the compensation to be paid for that year must be examined against the factual background existing as of that day and in the light of the previous year's events. Selective service was creating the largest peacetime army in history. On May 27, 1941, the President had proclaimed an unlimited national emergency. By the lend lease act adopted March 11, 1941, the nation was committed to a policy of serving as an arsenal for those countries waging war against the Axis. Petitioner's officers were intelligent and able men. They were certainly aware that the United States' preparedness program would be expanded more than ever in the ensuing year, all of which would mean increased production demands and the opportunities *231 for greater profits. Likewise, petitioner's officers must have been aware of the new excess profits tax contained in the Second Revenue Act of 1940. To make their excess bonus for 1941 contingent on corporate profits exceeding $150,000 was not much of a gamble. In spite of this, however, we think the record demonstrates convincingly that these men are entitled to some increase in compensation over what they had received in 1940. They are entitled to be well paid for successfully carrying out the plans conceived earlier and setting up production lines to meet the new demands for petitioner's products. Their skill in setting up production lines, keeping the plant operating without interrupting production during these months should be recognized. Their work required long hours of hard work and painstaking detail as well as the highest technical and executive ability. We have increased the allowances made by the respondent to conform to the $25,000 bonus distributed by petitioner in 1940. For the year 1942 petitioner has failed to demonstrate to our satisfaction that these men are entitled to the compensation paid in that year. There is no explanation for the increase over 1941. The *232 increased hours of work on the part of all the employees, including the officers, has been recognized in part, at least, by respondent. We do not mean to belittle the efforts of these officers during the critical year 1942, yet we think that in that year it was more a question of keeping production lines running smoothly than organizing and creating the facilities for production, as was the case in the other years. In such instances we are required to use our best judgment as to what constitutes a reasonable compensation for services. See . Pursuant to the suggestions of the Circuit Court in that case and in , we have modified the compensation paid by sustaining in part respondent's disallowance of the $50,000 paid to these men as a group. We are satisfied on the basis of the evidence that such amounts will result in reasonable and adequate compensation for the services rendered by petitioner's officers, including Bloodsworth, during the taxable year 1942. We have so found. Counsel for the parties hereto advise that the recomputation of the taxes involved *233 in Docket No. 6054 for the taxable year 1942, can not be made pending the outcome of a renegotiation case involving taxes for the same year. Recomputations for such year will, therefore, be held in abeyance accordingly. Decisions will be entered under Rule 50.